578 A.2d 779

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Arthur Stanley LAZEROW.

Misc. (Subtitle BV) No. 15, Sept. Term, 1989.

Court of Appeals of Maryland.

Sept. 6, 1990.

Melvin Hirshman, Bar Counsel, and Kendall R. Calhoun, Asst. Bar Counsel, for the Atty. Griev. Com'n of Maryland.

Andrew Jay Graham, Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS * and CHASANOW, JJ.

RODOWSKY, Judge.

■ Respondent, Arthur Stanley Lazerow (Lazerow), a non-practicing member of the bar, was, at the time of the events involved here, a real estate developer, rental property manager and builder of "for sale" homes for low and moderate income markets in Frederick and Montgomery Counties. Under great financial and emotional pressures, described below, Lazerow used in excess of $200,000 of home purchasers' down payments, statutorily required to be held in escrow accounts, to pay bills of the respective home building enterprises. He then fraudulently misrepresented to a Montgomery County investigator that the escrow funds were intact. We shall disbar.

The Attorney Grievance Commission charged Lazerow with a number of violations, all of which essentially involve former Maryland Rule 1230, Appendix F, the Code of Professional Responsibility, which governed conduct prior to January 1, 1987, DR 1–102(A)(4). Under DR 1–102(A)(4) a lawyer shall not "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." We referred the charges to Judge Paul A. McGuckian of the Circuit Court for Montgomery County for hearing. At that hearing, counsel for the parties submitted on the record made before the inquiry panel. See Maryland Rules, Ch. 1100, Subtitle BV, Rule BV6d. Judge McGuckian found that the charges had been sustained. Lazerow has filed exceptions, the principal ones of which we shall address after stating the facts.

---

\* Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Art. IV, § 3A, he also participated in the decision and the adoption of this opinion.

Lazerow studied law while he was an officer in the United States Navy, stationed in Washington, D.C. His academic record was excellent. He was admitted to the Maryland bar in 1972, but has never practiced. Lazerow joined his first wife's father, Harry Myerburg (Myerburg),[1] in business. Predominately, they developed FHA financed, multi-family rental housing in metropolitan Baltimore.

In early 1976 Lazerow, with financial assistance from Myerburg, started in the housing business for himself with a large project in Frederick County. The business grew and grew. He was developing multiple projects simultaneously in Frederick and Montgomery Counties. The staff in the local Frederick office reached a peak of twelve or thirteen people. But the business was spread too thin. There was not enough equity in the project to support the cash flow requirements for a business of the size to which Lazerow's operations had grown. Lazerow attributes the cash crunch to many factors, including underestimating the cost of development and setting the prices of the houses at less than market.

By the middle of 1986 Lazerow's enterprises owed money or had obligations to everyone with whom they were dealing. Contractors were calling, demanding payment. Buyers were calling, demanding to know when their homes would be completed.

By his having continuously plowed back profits, approximately $1.6 million of Lazerow's own funds were invested in the business. As his financial affairs grew worse during the fall of 1986, he became increasingly emotionally distraught so that he was unable to sleep, lost track of what he was doing, began taking sleeping pills, lost sight of his priorities, and lost his sense of self-worth.

Prior to October 1986, Lazerow had used all of the customer deposits in payment of business expenses incurred by the respective entities with which the deposits had been

---

1. The spelling is the court reporter's.

made. Md.Code (1974, 1988 Repl.Vol.), § 10–301 of the Real Property Article (RP) requires, absent surety bonding, that the builder of a new, single-family, residential unit, which is not completed at the time of contracting, hold, in a segregated escrow account, any of the purchaser's money received before completion of the unit and grant of the realty to the purchaser. Violation of this requirement is a misdemeanor, *see* RP § 10–305, carrying up to six months' imprisonment.

Lazerow explained how his invasion of the escrows came about.

"I was looking for just every avenue to try to build the houses that we had obligated ourselves to, and that was one source of funds that were sitting there—that the depositors had given us. And I knew it was wrong. I knew we shouldn't have, but it was—with the pressures I was under it was an easy course. Of all the possibilities, it was the course I chose." [2]

Judge McGuckian describes what happened next.

"In or around October 1986, after receiving complaints from customers of Respondent's businesses, the Montgomery County Office of Consumer Affairs requested verification from the Respondent that customer deposits were being maintained in an escrow account. The Respondent opened an account, on or about October 22, 1986, at the First Fidelity Bank, Account No. 1083171 entitled Old Potomac Park Customer Deposit Account. He deposited $251,000.00 into that account between November 3 and November 6, 1986. On or about November 10, 1986, the Respondent wrote to the Montgomery County Office of Consumer Affairs enclosing a verification from the First Fidelity Bank showing a balance of $251,-050.00 on deposit in the Old Potomac Park Customer Deposit account and represented that home buyers who

---

**2.** In quotations from the transcript of the inquiry panel proceedings, we have supplied our own punctuation for that appearing (or not appearing) in the transcript prepared by the reporting service.

had not yet settled had outstanding deposits in the amount of $237,000.00. On or about November 12, 1986, the Respondent withdrew checks totalling $251,000.00 from the customer deposit account payable to Frederick Heights Management Company, Inc., another of the Respondent's companies, leaving a balance in the customer deposit account of $50.00. The Respondent opened the Old Potomac Park Customer Deposit Account at First Fidelity Bank for the admitted purpose of misleading the Montgomery County Office of Consumer Affairs into believing that customer deposits were being maintained in an escrow account by the Respondent.

Lazerow acknowledged that the temporary deposit, above described, was "clearly a sham. It was intentional—to kind of get me over—to cover up what I had done—the effort to build the houses, sell them—and the problem would go away."

Judge McGuckian further found:

"Compounding the Respondent's financial stress were the deaths of two employees and the stroke suffered by his mother-in-law. All these events culminated in a suicide attempt on January 8, 1987. Thereafter, Respondent received psychiatric therapy for depression through November 1988."

Lazerow attempted suicide by sitting in his garaged automobile with its motor running. He was hospitalized for about eight weeks. During the first week, his system was purged of carbon monoxide. Thereafter he was confined, for his own protection, in the psychiatric ward of a hospital.

Ultimately the creditors foreclosed. It appears that there was sufficient equity in perhaps two entities to work out an arrangement under Chapter II. In February 1989, at the time of the inquiry panel hearing, Lazerow was back in business on a greatly reduced scale.

The State's Attorney for Montgomery County considered criminal prosecution. Myerburg came forward and offered to lend Lazerow up to $200,000 in order to make restitution.

This offer was subject to at least three conditions: (1) That the State would not prosecute; (2) that Lazerow would continue receiving psychiatric help; and (3) that Myerburg's accountant be a required co-signer with Lazerow on all business checks and have free access to the books and records.

Lazerow's initial reaction to giving up, in essence, control of his business was "not kindly," but he decided the "real important thing was to make as much right as possible." He agreed to the conditions, and full restitution has been made. He was not prosecuted. He also fully cooperated with the Consumer Affairs Office in identifying all those entitled to reimbursement of escrow funds. The total amount of restitution was $207,000, the additional $7,000 of which was raised by Lazerow's father, who placed a second mortgage on his home.

Judge McGuckian found that Lazerow "used the home buyer deposits to complete the construction of the houses and not for personal enrichment." It was found that Lazerow's intent in utilizing the escrow funds "was to facilitate the development of the houses and not to ultimately deprive the depositors of their funds[.]"[3] Judge McGuckian further found that Lazerow's conduct, *vis-a-vis* the Consumer Affairs Office, although "not for the furtherance of any immediate personal financial gains ... clearly show[ed] an intent to mislead (i.e., fraudulent intent)."

In his first principal exception Lazerow argues that each of the Disciplinary Rules that he was found to have violated "contemplates willful and intentional wrongdoing, with bad intent," but that his actions, "due to the prevailing external

---

3. Lazerow testified:
"We way underestimated, and, in my desire to build the houses, I had actually made the decision to finish and to take the loss in [the] houses. I was pumping all this money into that even though I knew there was going to be a big loss when we finished. It wasn't like I was trying to, kind of, squeak through and then make a profit at the end. I was going to squeak through and make a loss at the end, but at least it was going to get people their houses."

circumstances and his resulting mental and emotional condition, were not willful or intentionally wrong." We overrule the exception. A member of the inquiry panel asked Lazerow whether key people in his operation had objected to the transfer of funds out of the escrow accounts. He replied that "they didn't have to object because I was all along saying this was wrong. I knew it was wrong. I had verbalized it was wrong." While people on the financial side of his operation knew he was using the escrow funds, the use was "goal directed, to finish the houses...."

■ This Court has made it clear that, absent compelling extenuating circumstances justifying a lesser sanction, misappropriation by an attorney of funds entrusted to the attorney's care warrants disbarment. *Attorney Grievance Comm'n v. Ezrin*, 312 Md. 603, 608–09, 541 A.2d 966, 969 (1988); *Attorney Grievance Comm'n v. Pattison*, 292 Md. 599, 609, 441 A.2d 328, 333 (1982); *Attorney Grievance Comm'n v. Burka*, 292 Md. 221, 225, 438 A.2d 514, 517 (1981). This is true even where the misappropriation is committed in a nonprofessional capacity, since it involves a breach of trust or a fiduciary relationship and bears upon the fitness of a lawyer to practice his profession. *Attorney Grievance Comm'n v. Silk*, 279 Md. 345, 347–48, 369 A.2d 70, 71 (1977).

In explaining why, if he were permitted to practice law in the future, he would do so honestly and ethically, Lazerow explained:

"I think that one of the things that got me in trouble is the fact that I was not holding these deposits in a fiduciary, as a fiduciary, as a lawyer. I wasn't holding their money as a client, but instead just sort of—I kind of saw it as more amorphous."

This view is contrary to what this Court said in *Maryland State Bar Ass'n v. Agnew*, 271 Md. 543, 550, 318 A.2d 811, 815 (1974):

"The professional ethical obligations of an attorney, as long as he remains a member of the bar, are not affected

by a decision to pursue his livelihood by practicing law, entering the business world, becoming a public servant, or embarking upon any other endeavor."

The second principal exception is directed to the absence of any finding of compelling, extenuating circumstances justifying a lesser sanction than disbarment. Judge McGuckian concluded "that there is no clear and convincing evidence that the mental condition of the Respondent in January 1987 and thereafter was to a substantial degree responsible for his earlier misconduct." Lazerow excepts, pointing out that the more relevant period is the fall of 1986. He contends that this record requires a finding that, during the fall of 1986, "his unstable mental and emotional condition was to a substantial degree responsible for the misconduct." We deny the exception.

Testifying for Lazerow was the psychiatrist who had led Lazerow's therapy group during his hospitalization in January and February 1987 and who treated Lazerow as a private patient from June 1987 through November 1988. During his hospitalization, Lazerow was diagnosed as experiencing a depression. It could be said to be a deep depression. It was not the kind that is particularly responsive to anti-depressant medication but "was more related to circumstances[.]" Over the years Lazerow had kept his problems "very much to himself." He had been under increasing pressure for a period of several months. "[H]e had always prided himself at being able to solve his business problems and to do well by his investors and backers and there was a point coming where he realized that he was financially not able to do that." As the psychiatrist understood the history, Lazerow "tried every means possible and over a period of time became increasingly depressed and he was not able to reverse that situation. [He] saw himself, saw—in his words—as very intertwined with that of ... his successes and his business person; and as his business problems grew and grew, he felt that, increasingly, that he was not worthwhile and that everyone would be better off if he were dead."

With respect to his financial dealings the psychiatrist testified that Lazerow's "sense was that he was going to build these homes, employ these people, and was going to do everything possible to make it happen." The psychiatrist was of the view that one

> "probably could have sat him down right then and said, 'Is this all right to do?' Probably the answer would be, 'No.' But was it all right to do because it all fit in ... to his project, or to his plan to deliver a good product to the individual?
>
> "I think that the boundaries probably didn't get thought about too much."

Judge McGuckian obviously focused on January 1987 because the diagnosis of major depression was made with respect to the suicide attempt at the time of hospitalization. The invasion of the escrow funds took place over an unspecified period of time, prior to the deception practiced on the Consumer Affairs Office in October 1986. There is no evidence of deep depression coinciding with the onset of the defalcations. The evidence does disclose a success-driven personality who was under increasing pressure and who was increasingly depressed by late 1986. But creation of the spurious escrow account in October shows a calculated deception, assembled and then disassembled over a period of time. Judge McGuckian was not clearly erroneous in declining to find that a "mental condition was to a substantial degree responsible for the conduct" comprising the disciplinary violations. *See Attorney Grievance Comm'n v. Nothstein,* 300 Md. 667, 686, 480 A.2d 807, 817 (1984).[4]

Lazerow's general good character and reputation, the lack of prior misconduct, his restitution of the funds and his remorse and shame are not compelling extenuating circum-

---

**4.** In *Ezrin* we used, without comment, the standard employed by the judge who had conducted the evidentiary hearing. We said the judge was not "clearly erroneous in concluding that Ezrin's mental condition was not responsible for his misconduct and that he was not unable to control his criminal actions." 312 Md. at 608, 541 A.2d at 968–69.

stances that would warrant a sanction less than disbarment. *See Attorney Grievance Comm'n v. Ezrin,* 312 Md. 603, 541 A.2d 966.

Accordingly, the Court, a majority concurring, shall order that Arthur Stanley Lazerow be disbarred and that his name be stricken from the rolls of those authorized to practice law in this State. Judges Eldridge, Cole and Chasanow would impose an indefinite suspension.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV 15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST ARTHUR STANLEY LAZEROW.