810 A.2d 487

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND,**

v.

**Robert M. SPERY.**

**Misc. AG No. 8, Sept. Term, 2002.**

Court of Appeals of Maryland.

Nov. 6, 2002.

562

Melvin Hirshman, Bar Counsel, James P. Botluk, Asst. Bar Counsel, for the Atty. Grievance Com'n of Maryland.

William A. Clarke, Salisbury, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

RAKER, Judge.

The Attorney Grievance Commission, acting through Bar Counsel, filed a petition with this Court for disciplinary action against Robert M. Spery, respondent, alleging violations of the

Maryland Rules of Professional Conduct (hereinafter "MRPC"). The Commission charged respondent with violating MRPC 8.4(c) (Misconduct).[1] We referred the matter to Judge Donald F. Johnson of the Circuit Court for Dorchester County to make findings of fact and proposed conclusions of law. Following an evidentiary hearing, Judge Johnson concluded that respondent violated Rule 8.4(c).

## I.

Judge Johnson made the following Findings of Fact and Conclusions of Law:

### Findings of Fact

"Before this Court is the Petition for Disciplinary Action, filed by the Attorney Grievance Commission of Maryland, by Melvin Hirshman, Bar Counsel, and James P. Botluk, Assistant Bar Counsel, hereinafter 'Petitioners.' Petitioners allege that Robert M. Spery, Esquire, hereinafter 'Respondent,' violated Rule 8.4(c) of the Maryland Rules of Professional Conduct in the course of Respondent's management of a partnership. Petitioners allege that the Respondent misappropriated partnership funds by writing partnership checks payable to himself in a total amount of approximately $47,000.00. The Respondent argues that he merely took the money as a loan, and never borrowed more than his partnership interest. An evidentiary hearing was held on the 12th day of June, 2002.

"In December of 1982, the Respondent, together with Eugene A. Walsh, Esquire and Arthur D. Webster, Esquire, collectively, the 'Partners,' purchased the building located at 110 Baptist Street, Salisbury, Maryland, under the form of a partnership, known as the 'Baptist Street Associates,' with each Partner owning a one-third interest. Formal partner-

---

1. Rule 8.4 (Misconduct) provides, in pertinent part, as follows:
 "It is professional misconduct for a lawyer to:
 (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

ship articles were never drawn up. The Partners used this building as the office of their law firm, Webster, Walsh, & Spery.

"Sometime in 1984, the Partners ceased practicing law together and decided to maintain 110 Baptist Street as a rental property. Mr. Webster managed the partnership books until early in 1993 at which time the Respondent became the managing partner. Shortly before the Respondent became the managing partner a new tenant was acquired requiring renovations to the building. The Partners elected to refinance the building in order to obtain the money for the renovations. The building was appraised at approximately $192,000.00 and refinanced for approximately $155,000.00. The renovations were completed for approximately $25,000.00 and each partner received approximately $29,000.00 for his share of the accumulated equity in the partnership. Inquiry Panel Hearing, T. 17–20.

"As managing partner, the Respondent's duties included collecting rent, completing repairs, paying taxes, paying for insurance, and making payments on the mortgage. The Respondent furnished copies of partnership tax returns to the other partners. The other partners became concerned about how the partnership was being managed after the Vice President and Loan Officer of Peninsula Bank notified them, in the spring of 1999, that loan payments were late. Mr. Walsh obtained a loan history from the bank and discovered that approximately twenty-seven of the last thirty-six payments had been late and that late fees had been incurred. Mr. Walsh and Mr. Webster were also concerned about the excessive repairs and a note that had been appearing on the partnership tax returns.[1] They called a partnership meeting in April of 1999 to discuss these matters with the Respondent.

---

1 When questioned by Mr. Walsh about the note, the Respondent represented that it was incorrect and that the accountant had made an error. For the period from 1994 to 1998, approximately $18,000.00 was reported on the tax returns for repairs, however Mr. Walsh 'would drive by the building periodically and couldn't see where all the money was going.' Inquiry Panel Hearing, T. 101.

"At the meeting the Respondent did not reveal that he was, as he now alleges, borrowing from his partnership interest. Instead, the Respondent apologized for the late payments and represented that he had not been attentive to the mortgage. The Respondent also represented that the other partners owed him thousands of dollars for repairs that the Respondent had paid for with his own money. The Respondent offered to sell his interest in the partnership for $20,000.00. The other partners agreed to consider this offer but first requested that the Respondent prepare an invoice for his out-of-pocket expenses and deliver the partnership books to the other partners to study.

"The Respondent never completed an invoice and did not deliver the books to the other partners until late in September 1999, after Mr. Webster had made numerous phone calls and sent letters to the Respondent. When the books were finally delivered, the Respondent explained that he had lost four or five years worth of records. Mr. Webster then obtained from Peninsula Bank, at a cost of approximately $1,000.00, copies of the missing bank statements, deposit slips, and returned checks that had been preserved by the bank on microfilm.

"Upon review of the documents, Mr. Webster discovered that the Respondent had written numerous checks payable to himself. Mr. Webster calculated that the Respondent had taken from the partnership in the course of five years, without authorization, the amount of $47,821.16. Mr. Webster discovered that, at times, the partnership account lacked sufficient funds to make the mortgage payment. Mr. Webster also discovered that the Respondent periodically placed money back into the account. After the April 1999 meeting the Respondent deposited approximately $34,000.00 into the account.[2]

2 In 1995, during the course of the year, the Respondent took $7,788.90 and returned $3,950.00. In 1996, the Respondent took $9,287.77. In 1997, the Respondent took $14,032.53 and returned $4,250.00. In 1998, the Respondent took $9,201.93 and returned $5,450.00. In 1999, the Respondent returned $34,422.15. Inquiry Panel Hearing, T. 35–36.

"The checkbook entries turned over by the Respondent reflect that the Respondent reported these disbursements as payments to 'RMS' for 'various,' 'maintenance various,' and some bear no explanation at all. On some of the check stubs the entries have been erased or written over. Plaintiff's Exhibit No. 3.

"Sometime in 2000, the Partners reached an agreement by which the Respondent agreed to sign over his one-third interest in the building to Mr. Walsh and Mr. Webster and pay them a sum of $45,000.00. This amount was to be paid in nine equal payments of $5,000.00, payable every three months beginning March 31, 2000. In exchange, Mr. Webster and Mr. Walsh agreed 'that so long as the terms of this agreement are fulfilled on a timely basis, that neither of us will discuss our relationship with you regarding this building with any other person.' Letter of January 23, 2000 (Inquiry Panel Hearing, Exhibit BC 8). The Respondent explained that he agreed to this arrangement because he 'didn't want to end up on the front page of *The Daily Times.*' Inquiry Panel Hearing, T. 153.

"The Respondent made three of the scheduled payments, however the third payment was late.[3] Before the third payment had been received, Mr. Walsh reported the Respondent to the Attorney Grievance Commission by letter dated January 9, 2001. Mr. Walsh decided to report the Respondent because he could no longer endure the 'sleepless nights' and 'waking in a cold sweat.' December 26, 2000, letter authorized by Eugene A. Walsh to Arthur D. Webster (Inquiry Panel Hearing, Exhibit Resp 2). Mr. Walsh explained that his decision was also based on the Respondent's threat to 'take [Mr. Walsh and Mr. Webster] down too.' Inquiry Panel Hearing, T. 112.

3 The first payment, made by check payable to Eugene A. Walsh and Arthur E. Webster, was paid on March 29, 2000. The second check was dated June 30, 2000, and the third check was dated January 18, 2001. According to the agreement, the third payment was due on September 30, 2000.

"The Respondent admits to taking the money but argues that he never took 'more from the partnership capital than

what the value of his one-third interest would have been.' Evidentiary Hearing, T. 12. The Respondent reported the money on his personal tax returns as income. In light of the Respondent's misrepresentations at the partnership meeting in April 1999 and his attempts to conceal his actions, considering the misappropriations to be loans would not be an accurate characterization. The Respondent converted partnership money to his own use without authorization and without disclosure to the other partners.[4] The Respondent made ambiguous entries in the partnership books, misrepresented his conduct to the other partners, and attempted to conceal his actions. The Respondent has demonstrated a lack of probity, integrity and straightforwardness in conduct. The Court finds by clear and convincing evidence that the Respondent has engaged in dishonest conduct in violation of Rule 8.4(c) of the Maryland Rules of Professional Conduct.

4 The Respondent explained that he borrowed the money in part to pay for his daughter's private school tuition. However he intended 'to clean it up in September' once he would be off the private school tuition 'hook' and would become eligible to withdraw from his 'independent' retirement account. Inquiry Panel Hearing, T. 180.

"The Respondent argues that he only borrowed the money and 'replaced far more money than he ever took, not only initially but by submitting to ... blackmail or extortion by Webster and Walsh.' Evidentiary Hearing, T. 15. Although the subsequent conduct of the other partners may be equally deplorable, their conduct is not a defense to the Respondent's own dishonesty."

## II.

Neither party has taken exceptions to the hearing judge's findings of facts or conclusions of law. Consequently, the only issue in this proceeding is the appropriate sanction to be imposed. Bar Counsel recommends disbarment; Respondent recommends a reprimand.

[1, 2] The primary purpose in imposing discipline on an attorney for violation of the Rules of Professional Conduct is

not to punish the lawyer but rather to protect the public and the public's confidence in the legal profession. *Attorney Grievance Comm'n v. Powell,* 369 Md. 462, 473, 800 A.2d 782, 789 (2002). Disciplinary proceedings also are aimed at deterring other lawyers from engaging in similar conduct. *Id.*

Misappropriation, by an attorney, of funds entrusted to his or her care is an act infected with deceit and dishonesty and, in the absence of compelling extenuating circumstances justifying a lesser sanction, will result in disbarment. *Attorney Grievance Comm'n v. Culver,* 371 Md. 265, 808 A.2d 1251 (2002); *Attorney Grievance Comm'n v. Sullivan,* 369 Md. 650, 655–56, 801 A.2d 1077, 1080 (2002); *Attorney Grievance Comm'n v. Vlahos,* 369 Md. 183, 186, 798 A.2d 555, 557 (2002); *Powell,* 369 Md. at 475, 800 A.2d at 789; *Attorney Grievance Comm'n v. Vanderlinde,* 364 Md. 376, 410, 773 A.2d 463, 483 (2001); *Attorney Grievance Comm'n v. Sabghir,* 350 Md. 67, 84, 710 A.2d 926, 934 (1998); *Attorney Grievance Comm'n v. Ezrin,* 312 Md. 603, 608–09, 541 A.2d 966, 969 (1988); *Attorney Grievance Comm'n v. Nothstein,* 300 Md. 667, 687–88, 480 A.2d 807, 818 (1984); *Attorney Grievance Comm'n v. Silk,* 279 Md. 345, 347, 369 A.2d 70, 71 (1977). In cases warranting disbarment, such as those involving intentional dishonesty, fraud, misappropriation and the like, we will not accept as compelling extenuating circumstances "anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the 'root cause' of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC." *Vanderlinde,* 364 Md. at 413–14, 773 A.2d at 485.

Bar Counsel argues that disbarment is the only appropriate sanction for respondent's conversion of partnership funds to his own use, concealment of his wrongdoing from his partners, and the misrepresentations to his partners. In mitigation, respondent argues that the absence of any prior discipline over twenty-eight years of law practice, a timely, good faith effort to rectify the consequences of his misconduct,

cooperation with Bar Counsel and acceptance of responsibility, and other "punishment" incurred by the actions of his injured partners, all justify a downward departure in the sanction "from the ordinarily applicable sanction of a reprimand to the lesser sanction of admonition." [2]

As support for his position, respondent relies on Standard 5.13 of the American Bar Association's Standards for Imposing Lawyer Sanctions (1991, 1992 Supp.) (ABA Standards). Standard 5.13 reads as follows:

"Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law."

Respondent's reliance on Standard 5.13 is misplaced. Rather, his conduct falls within Standard 5.11, which reads as follows:

"Disbarment is generally appropriate when:

(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation

---

**2.** Under the ABA Standards for Imposing Lawyer Sanctions, an admonition, "also known as a private reprimand, is a form of non-public discipline which declares the conduct of the lawyer improper, but does not limit the lawyer's right to practice." Standard 2.6 Admonition. We point out that although ABA Standards for Imposing Lawyer Sanctions, 5.14, provides for an admonition under certain circumstances, an admonition is not an available sanction under the MRPC. Standard 5.14 reads as follows:

"Admonition is generally appropriate when a lawyer engages in any other conduct that reflects adversely on the lawyer's fitness to practice law."

Even under the ABA Standards, respondent's conduct would not fall within 5.14.

that seriously adversely reflects on the lawyer's fitness to practice."

The commentary to this standard reflects the view that a lawyer who engages in serious illegal conduct should be disbarred. On the other hand, Standard 5.13 applies to *any other conduct* or situation in which the lawyer's conduct, although not criminal or related to the practice of law, nonetheless requires some form of discipline. Respondent's conduct falls within 5.11, *not* within 5.13.

In *Ezrin*, the attorney stole large sums of money from his law partners. After his dishonest conduct was discovered, he made restitution to the law firm. Before this Court, Ezrin argued as mitigation, his remorse, as well as the fact that he misappropriated the money because of "his disabling emotional state, and [that the theft] did not involve client funds." *Ezrin*, 312 Md. at 606, 541 A.2d at 967. We reviewed the arguments he advanced in mitigation of his misconduct, including his fine reputation as a lawyer, his general good character, his lack of prior disciplinary actions, restitution made to his law firm, and his cooperation with Bar Counsel. *Id.* at 609, 541 A.2d at 969. We rejected his arguments, finding no extenuating circumstances, and imposed the sanction of disbarment.

In *Attorney Grievance Comm'n v. Lazerow*, 320 Md. 507, 578 A.2d 779 (1990), the attorney misappropriated monies he held as down payments for home purchases. There, too, we rejected the attorney's argument that his general good character and reputation, the lack of prior misconduct, his restitution of the funds, and his remorse and shame were compelling extenuating circumstances to justify a sanction less than disbarment. *Id.* at 515–16, 578 A.2d at 783.

Respondent's case is no different. It is of little moment that respondent stole from his real estate partners and not from his clients. His fraudulent, criminal conduct acting on his own behalf for his personal gain to the detriment of his partners is no less reprehensible than when he acts on behalf of a client. *See Vlahos*, 369 Md. at 187, 798 A.2d at 557;

*Ezrin*, 312 Md. at 604–09, 541 A.2d at 966–69; *Nothstein*, 300 Md. at 687, 480 A.2d at 817; *Lazerow*, 320 Md. at 513, 578 A.2d at 782; *Silk*, 279 Md. at 348, 369 A.2d at 71. That respondent chose to steal from his real estate partners rather than from his clients makes no difference in the disciplinary sense and does not justify a lesser sanction than disbarment. Respondent's dishonest and selfish motive is an aggravating factor for disciplinary purposes. His conduct was intentional and was knowing conversion of partner funds. Respondent engaged in a pattern of misconduct over an extended period of time.

 Respondent's lack of previous discipline, cooperation with the investigation, and restitution are mitigating factors, but do not justify a lesser sanction. Respondent asks that we consider as a mitigating circumstance the "exorbitant payments" exacted as blackmail or extortion by the other partners. Respondent's argument is that the payments of blackmail constituted the "imposition of other penalties or sanctions," a mitigating factor under ABA Standard 9.32(k). Although this Court repeatedly has cited this factor as appropriate for consideration in fashioning a sanction in disciplinary matters, *see e.g., Attorney Grievance Comm'n v. DiCicco*, 369 Md. 662, 686–87, 802 A.2d 1014 (2002); *Attorney Grievance Comm'n v. Garfield*, 369 Md. 85, 102, 797 A.2d 757, 767 (2002); *Attorney Grievance Comm'n v. Jaseb*, 364 Md. 464, 481–82, 773 A.2d 516, 526 (2001); *Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 488–89, 671 A.2d 463, 483 (1996), we have not had occasion to discuss the application of this factor.

In those jurisdictions that have found other penalties or sanctions as mitigation justifying a lesser sanction, the courts have considered those other penalties or sanctions only where the sanctions were disciplinary or punishment in nature. For example, in *In re Lamberis*, 93 Ill.2d 222, 66 Ill.Dec. 623, 443 N.E.2d 549 (1982), the Illinois Supreme Court imposed a censure rather than suspension on an attorney who plagiarized portions of an LL.M. thesis in view of, in part, the disciplinary

sanctions which had already been imposed by the attorney's university. In the *Matter of Garrett,* 272 Ind. 477, 399 N.E.2d 369 (1980), the Indiana Supreme Court imposed a reprimand on an attorney convicted of a second criminal violation where the attorney's initial suspension had been extended in light of the new case. *See also, In re Levine,* 174 Ariz. 146, 847 P.2d 1093 (1993) (holding that imposition of other sanctions and fees by the court, to the extent that the attorney had paid them or will pay them in the future, justified reduced sanction).

In contrast, any "punishment" incurred by respondent at the hands of his partners is not discipline for his misconduct. The hearing judge found that "[a]lthough the subsequent conduct of the other partners may be equally deplorable, their conduct is not a defense to the Respondent's own dishonesty." We agree. Neither are the financial ramifications of his misconduct a mitigating factor in the disciplinary sense. That his partners may have profited improperly at his expense is not the subject of these proceedings, and any determination with respect to the propriety of their actions must await another day and another forum.

Disbarment is the appropriate sanction. The name of Robert M. Spery will be stricken from the rolls of those authorized to practice law in this State.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761(b), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST ROBERT M. SPERY.*