829 A.2d 567

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Scott G. SMITH.

Misc. Docket AG No. 16, Sept. Term, 2002.

Court of Appeals of Maryland.

July 30, 2003.

Melvin Hirshman, Bar Counsel, Dolores O. Ridgell, Asst. Bar Counsel for Attorney Grievance Commission of Maryland, petitioner.

Francis S. Brocato, Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

CATHELL, J.

Bar Counsel, on behalf of the Attorney Grievance Commission, petitioner, and at the direction of the Review Board, filed a petition with this Court seeking disciplinary action against Scott G. Smith, respondent,[1] pursuant to

---

1. Mr. Smith was admitted to the Bar of this Court on February 2, 1989, and is also admitted to practice in Florida, Virginia and the District of Columbia. At the time of the conduct which is the subject of this

Md. Rule 16–751.[2] The petition, which is based on the four complaints of Mr. Mark R. Bryers, Mr. William L. Kent, Mr. William R. Campbell and Mr. William S. Campbell and Mr. Thomas S. Carswell, alleges that respondent violated several provisions of the Maryland Rules of Professional Conduct (MRPC),[3] two provisions of the Business Occupations and

---

disciplinary action, respondent maintained an office for the practice of law in the District of Columbia and in Anne Arundel County, Maryland.

**2.** The pertinent language of Maryland Rule 16–751 states that, "Upon approval of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals."

**3.** The provisions of the MRPC that are relevant here include:

"**Rule 1.15. Safekeeping property.**
(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

. . .

"**Rule 8.1. Bar admission and disciplinary matters.**
An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:

. . .

(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or

Professions Article of the Maryland Code,[4] and Maryland Rule 16–609.[5]

On April 8, 2002, pursuant to Maryland Rule 16–752 and 16–757,[6] this Court assigned the matter to Judge Nancy L. Davis–

---

disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.

. . .

"**Rule 8.4. Misconduct.**
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; .
(d) engage in conduct that is prejudicial to the administration of justice; . . . ."

4. Maryland Code (1989, 2000 Repl.Vol., 2002 Supp.) §§ 10–306 and 10–606 of the Business Occupations and Professions Article provide:
" **§ 10–306. Misuse of trust money.**
A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

. . .

" **§ 10–606. Penalties.**

. . .

(b) *Attorney trust accounts.*—A person who willfully violates any provision of Subtitle 3, Part I of this title, except for the requirement that a lawyer deposit trust moneys in an attorney trust account for charitable purposes under § 10–303 of this title, is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 5 years or both."

5. Maryland Rule 16–609 states:
"**Rule 16–609. Prohibited transactions.**
An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer."

6. The relevant provision of Maryland Rule 16–752 states:
"(a) **Order.** Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require

Loomis in the Circuit Court for Anne Arundel County to conduct an evidentiary hearing and to make findings of fact and conclusions of law with respect to respondent's case. Respondent was duly served and he later filed a timely answer to the petition. The evidentiary hearing took place on November 26 and 27, 2002.

After the hearing, Judge Davis–Loomis found, by clear and convincing evidence, that respondent willfully misappropriated funds and was in violation of Maryland Rule 16–609, Md.Code §§ 10–303 and 10–606 of the Business Occupations and Professions Article, as well as MRPC 1.15(a) and (b), 8.1(b) and 8.4(a), (b) and (c). Respondent filed in this Court numerous exceptions to Judge Davis–Loomis' findings of fact and conclusions of law. We overrule all of respondent's exceptions to the findings in respect to the complaints filed against him and accept the hearing judge's findings of fact and conclusions of law in respect to those matters.[7] Considering respondent's egregious conduct, the appropriate sanction is disbarment.

the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing." Maryland Rule 16–757(c) states, in part, that "The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to evidence regarding remedial action, and conclusions of law."

7. We adopt Judge Davis–Loomis' findings and conclusions to the extent that they discuss and involve those individuals who actually filed complaints with petitioner against respondent, *i.e.*, the Bryers, Kent, Campbell and Carswell matters. Petitioner offered evidence of respondent's additional misconduct in other matters leading Judge Davis–Loomis to make findings related to respondent's misconduct in regard to Alan Little and Ronald Tygar pertaining to a loan for Rainbow Acquisitions and Development Corporation, Jonathan Vaughn pertaining to a loan for Prime Capital Investments Incorporated and John Carson who sought funding for a business venture. Although, in each of these instances, respondent's misconduct mirrored the misconduct he exhibited in the Bryers, Kent, Campbell and Carswell matters, no complaints were filed regarding these instances. Therefore, we shall not address further the facts or the trial court's findings relevant to those individuals who did not file complaints against respondent with petitioner. Respondent's misconduct as to the named complainants is sufficient to warrant the sanction we impose.

## I. Facts

The facts of the complaints in this case are deceptively complex. They are, however, similar in that they involve the same violations in each complaint actually filed against respondent.[8] Respondent, at the request of one of his clients, Stateline Capital Corporation (hereafter "Stateline"), a company engaged in funding high-risk loans, opened an escrow account entitled "Scott Smith PC Escrow Account" and agreed to act as escrow agent for Stateline in reference to this account. Stateline principals were James D. Payne and Stephen Ryan. Respondent and Payne, on behalf of Stateline, signed a Client–Counsel Agreement that called for respondent "to receive funds for and on behalf of Client [Stateline]; and ... to disburse according to Client's direction." (alteration added). Stateline, in turn, had various clients, including the five complainants in this case: Mr. Bryers, Mr. Kent, the Campbells and Mr. Carswell, who deposited money into respondent's escrow account. Respondent was to be paid $30,000 for his services. However, most important to these proceedings, there were several escrow agreements effectuated that should have governed respondent's actions differently than his agreement with Stateline and it is his violation of

---

**8.** The facts are deceptively complex due to the number of complaints, the various names of the depositors, the many attorneys and other third parties involved. For purposes of this opinion, we shall summarize the facts, partially reciting the factual findings of the hearing judge, omitting a factual discussion of those individuals who did not file a complaint against respondent as indicated *supra*, omitting a lengthy factual discussion indicating each individual involved and omitting an in-depth discussion of the timeline and circumstances of the various monetary transactions that occurred. As we discuss *infra*, the essential fact is that respondent, as escrow agent, received various deposits of large sums of money to be held in escrow, money that was to be returned to various depositors if funding for their various real estate and/or business transactions was not secured. Contrary to the Maryland Rules of Professional Conduct, the Business Occupations and Professions Article of the Maryland Code and Maryland Rule 16–609, respondent acted improperly and disbursed the funds out of the escrow account to other individuals for unauthorized purposes. Respondent's actions regarding the funds held in the escrow account originated the Petition for Disciplinary or Remedial Action filed against him by Bar Counsel and warrant our sanction in this matter.

these agreements as an escrow agent that is the basis of his attorney misconduct.

Stateline offered to obtain large monetary sums of venture capital to fund various real estate and business projects. As a result, individuals or groups who were interested in real estate development and other business interests were told to place a commitment fee in escrow with an escrow agent, respondent. The witnesses testified in depositions that they were told that the commitment fees would be held in escrow by respondent until Stateline secured the money needed for the various projects or, if the loans and funding did not go through, the commitment fees would be returned to the complainants. The commitment fees were to be held in escrow until the loan was funded and if the loan was not funded, the money was to be returned. The escrow terms were set out in multiple Escrow and Disbursing Agreements and, in one instance, an Escrow Agreement signed by respondent, Payne and/or Ryan and various individuals seeking high-risk loans.[9]

---

9. The various escrow agreements called for, among other things, the commitment fees to remain in escrow until the closing of the loan. The language in the various escrow agreements is similar. For example, pursuant to the Escrow and Disbursing Agreement entered into between Bryers and Stateline, wherein respondent was named as the escrow agent, Bryers was to place $100,000 into respondent's escrow account as a commitment fee for Stateline to secure a $7 million plus loan for a project known as "Heaphy House." Respondent's signature appears on this and other escrow agreements involved in these grievance proceedings. The Bryers escrow agreement provided that the $100,000 was "to be held and released to the designated recipient subject to the following terms and conditions." The following paragraph of the Escrow and Disbursing Agreement stated:

"3. Upon issuance and delivery, and notification to Agent [respondent] of a communication from the Attorney representing the bank that is to issue a confirmation commitment of funds on behalf of [Stateline] for the above named client [Bryers], the entire escrow amount shall be remitted to the Attorney representing the bank ... as earned. *If the confirmation commitment of funds is not received by the Escrow Agent within thirty (30) international banking days after the acknowledgment by the Attorney representing the bank of receipt of the funds, the Attorney representing the bank will wire ... the escrow funds back to the Escrow Agent for release to the above named [Bryers],* which will end any obligation that [Stateline] and [Respondent] have to [Bryers].... This Escrow Agreement is for a period of thirty (30)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

In part, Judge Davis–Loomis made the following factual findings:

"On January 8, 1999, Respondent opened an account at Nations Bank/Bank of America.... Respondent and his wife, Katherine N. Smith, were listed as persons with signatory authority on the account. The first deposit into the escrow account was made on January 8, 1999 in the amount of $100. The escrow account remained open until June 5, 2000, when Respondent withdrew the balance of $245.97.

"While the escrow account was open, Respondent received deposits of commitment fees totaling more than $1.9 million. Each commitment fee was held for only a short time and then was disbursed. After listening to testimony and reviewing extensive exhibits, this Court finds that these funds were regularly disbursed to entities having no connection to the entities depositing the commitment fees. Beneficiaries of these disbursements included Stateline principals, Respondent and his corporation, Legal Eagle, and Desmond Kramer, a personal friend of Respondent who had no involvement with Stateline.

"Stateline failed to fund any loans. At the present time, some customers have not received refunds of their commitment fees. Respondent testified that the Stateline transactions were the subject of the United States Attorney's Office in Nevada. Respondent testified that he presently believes that Ryan and Payne are 'swindlers.'

"The evidence clearly and convincingly establishes that Respondent played an active role in the Stateline scheme.

---

banking days from the date escrow is opened. *The funds will be held in escrow until the closing of the loan."* [Alterations added.][Emphasis added.]

The same "funds will be held in escrow until the closing of the loan" language appears in the escrow agreements entered into between Stateline and Kent (involving a $50,000 commitment fee), between Stateline and Campbell (involving a $200,000 commitment fee) and Stateline and Luis Moreno (involving a $100,000 commitment fee) in the Beaver Dam project, the transaction involved in the Carswell complaint.

Various depositors relied upon his reputation as a lawyer in good standing when agreeing to deposit money in the escrow account. Although Respondent may not have known what was expected of him when he agreed to act as escrow agent in November 1998, it was apparent to him by February 1999 that Stateline's customers were being misled as to the escrow agreements. Respondent's letter of February 12, 1999 makes it clear that Respondent made a conscious decision to assist Ryan and Payne in deceiving Stateline's customers into thinking that the commitment fees were being held in escrow.

"Respondent also used personal funds to pay obligations owed by Stateline not related to deposits to his escrow account. On June 28, 1999, he deposited $25,000 from his personal corporation, Legal Eagle, and then disbursed those funds to a Stateline client known as 1228 Collins Avenue. Respondent testified at trial that on July 15, 1999, he deposited $20,000 into the escrow account to pay Mayfair Trust. In reality, the $25,000 sent to Mayfair Trust on August 31, 1999 came from a commitment fee that an unrelated party had deposited into the escrow account on August 30, 1999. Respondent sent the $20,000 he had deposited into the escrow account from his personal funds to Ryan on July 19, 1999.

"The following are summaries of findings related to each of the deposits to the escrow account for which testimony or documentary evidence was presented.[10]

### "Mark R. Bryers

"On November 15, 1999, Petitioner received a complaint from Mark R. Bryers (hereafter 'Bryers'). Bryers alleged in his complaint that $100,000 had been transferred to Respondent's escrow account on February 19, 1999 as a

---

**10.** *See* footnotes 7 and 8. We omit the portions of Judge Davis–Loomis' findings that pertain to individuals who did not file complaints with petitioner against respondent and for which he was not clearly charged by petitioner. We accept and include the facts relevant to the Bryers, Kent, Campbell and Carswell matters.

commitment fee for a project known as Heaphy House, that Bryers was entitled to a refund, and that the funds had not been returned.

"Bryers provided Petitioner with a copy of a Financing Agreement and an Escrow and Disbursing Agreement. These agreements called for Stateline to provide a loan of over $7 million and for Bryers to deposit a $100,000 commitment fee in Respondent's escrow account. The Escrow and Disbursing Agreement called for the $100,000 to be held in escrow until the closing of the loan. The agreements further stated that Respondent was authorized to accept the commitment fee and agreed to do so. Respondent signed the last page of the Escrow and Disbursing Agreement and, according to the facsimile line, sent it to Bryers on February 12, 1999.

"The bank records indicate that Bryers transferred $100,000 to Respondent's escrow account on February 19, 1999. On February 25, 1999, these funds were disbursed and the balance in the escrow account was $72.12. In discovery, Respondent produced a copy of a letter dated July 14, 1999, from Respondent to Bryers stating that '[t]his will confirm that in the event the vendor of the Heaphy House project should pull out of this transaction, Stateline will cause the escrow funds to be returned pursuant to the Escrow Agreement.' Stateline did not provide financing within the time designated in the Financing Agreement, and Bryers requested a refund of the $100,000 commitment fee.

"On December 6, 1999, Petitioner's counsel sent Respondent a letter notifying him of the Bryers complaint. On or about December 21, 1999, Respondent provided a written response in which he represented that on or about December 17, 1999, he refunded Bryers' commitment fee plus interest. Respondent failed to disclose that the commitment fee he received from Bryers had long since been disbursed. In the December 6 letter, Petitioner also requested that Respondent provide copies of bank statements, cancelled checks and other records of the escrow account within 15 days. Respondent did not include these records

with his December 21 letter nor did he provide those records with a subsequent letter dated January 21, 2000 and received by Petitioner on January 27, 2000. Respondent did not disclose that he had refunded the Bryers commitment fee with his personal funds from another NationsBank account.

"On June 12, 2000, Respondent's counsel provided Petitioner with a copy of a letter dated March 17, 2000 that he received via facsimile. The letter is addressed from [Bryers's] counsel and is signed by Peter Rama, Bryers's solicitor. In the course of discovery, Petitioner received a similar document from Respondent that appears to be an unsigned draft of this same letter. The two letters differ in the wording of the second paragraph. The letter containing Peter Rama's signature states that '[f]urther, we understood that Stateline's efforts in connection with a loan syndication did necessitate the transfer of funds provided by me from my account with National Bank of New Zealand (furnished to support Mr. Bryer's application) to another attorney's escrow account in order to secure funding for the project.' The unsigned draft provided by Respondent stated that '[f]urther, we understood that Stateline's efforts in connection with a loan syndication might necessitate the transfer of Mr. Bryer's funds from NationsBank to another attorney's escrow account in order to secure funding for the project.' This Court declines to draw any conclusions as to the reason these two drafts exist but notes that the language of the unsigned draft is in direct contradiction to the parties' Escrow and Disbursing Agreement.

"In discovery, Respondent also produced a copy of a letter dated December 16, 1999 addressed to Respondent from Payne. This letter authorized Respondent to return the $100,000 commitment fee to Bryers and apologized to Respondent for not being available to give this authorization earlier. Petitioner's witness John DeBone testified that the Respondent produced this letter in discovery with a piece of white tape across the document. DeBone made a copy of the document and then removed the tape. The tape cov-

ered a facsimile transmission date of January 17, 2000, indicating that Respondent did not receive the letter until a month after he had used personal funds to repay Bryers.

### "William L. Kent

"On November 25, 1999, Petitioner received a complaint from William L. Kent (hereafter 'Kent'), alleging that on or about March 18, 1999, Kent entered into an agreement with Stateline whereby Stateline would arrange financing in excess of $8,000,000 for a project to purchase a marina. The agreement called for Kent to pay a refundable commitment fee of $100,000, but this fee was later reduced to $50,000. Respondent was to hold the commitment fee in escrow until the closing on the loan.

"Stateline provided Kent with an Escrow Agreement identifying the Respondent as escrow agent and instructing Kent to wire the funds to the Respondent's escrow account. Bank records reflect that on March 29, 1999, Respondent received a wire transfer from Kent in the amount of $50,000. Prior to the deposit, the balance of the escrow account was $51.94. On March 30, 1999, another investor in Kent's project deposited $25,000 into the escrow account. Later on that same day, the Respondent disbursed $50,000 to Abdel Hafid Lofty in Germany, presumably upon Ryan's instructions. On April 1, 1999, Respondent disbursed $7,000 to Payne, and, on April 2, 1999, Respondent disbursed $15,000 to Ryan. By April 2, 1999, the account balance was $36.00. Respondent presented no evidence showing that these disbursements were related to the financing of the Kent project.

"In June or July 1999, Kent contacted Respondent by telephone to inquire about the financing. The Respondent assured Kent that the funds were still in the escrow account. On or about September 27, 1999, Kent wrote to the Respondent and demanded the return of the $50,000 commitment fee. On or about October 8, 1999, Kent's counsel sent a letter to Ryan, which was copied to Respondent, demanding the return of the $50,000. Between October 8

and 20, 1999, Kent continued to contact Respondent requesting return of the commitment fee. The Respondent did not disclose to Kent that he no longer had the money in the escrow account.

"On or about November 16, 1999, Kent wrote to Petitioner concerning the Respondent's failure to return the escrow funds. On or about December 6, 1999, Petitioner notified Respondent of the Kent complaint and asked him to provide a written response and records for the escrow account. On or about December 21, 1999, the Respondent provided a written response to the Kent complaint to the Petitioner. He enclosed evidence that on or about December 9, 1999, the Respondent sent Kent a cashier's check in the amount of $50,000. Respondent did not provide the escrow records nor did he disclose in his response that the $50,000 commitment fee had not been maintained in the escrow account prior to December 9, 1999. Respondent's subsequent response that Petitioner received on January 27, 2000 and dated January 21, 2000 did not include the requested records.

### "William B. and William S. Campbell

"Petitioner received a third complaint against Respondent on January 16, 2001 from William B. and William S. Campbell alleging that they had wired $200,000 to Respondent's escrow account, that there had been a demand for the return of this money and that the funds had not been returned. Bank records indicate that $200,000 was deposited into the escrow account on May 6, 1999 on behalf of the Campbells. Prior to the deposit, the escrow account balance was $5,555.33. On May 6, 1999, Respondent disbursed $150,000 to an entity named Blanco Thackaberry and disbursed $50,000 to McGuire Woods, a law firm. On May 11, 1999, $5,000 was disbursed to an individual named Hal Goldberg. The balance on May 26, 1999 was less than $500. Respondent presented no evidence that these disbursements were related to the [Campbells'] loan financing.

"William B. Campbell stated at his deposition that he contacted Stateline on behalf of Asian Energy Ltd. regarding a $25 million loan for a stock purchase. William B. Campbell spoke with Respondent by telephone and obtained the routing numbers for the escrow account. On May 6, 1999, William B. Campbell faxed a copy of the Escrow Funds Provider Agreement between Asian Energy and The Bedford Group to Respondent. William B. Campbell stated at his deposition that he knew Respondent only as the escrow agent and not Stateline's guarantor. He indicated he would not have sent the funds if he had known the funds would not remain in Respondent's account, and, as of the date of his complaint to Petitioner, he believed the funds were still in Respondent's escrow account. William B. Campbell indicated that his son, William S. Campbell, handled the majority of communication concerning the escrow funds.

"William S. Campbell (hereafter 'Steve Campbell') wanted his own attorney to act as the escrow agent in the Stateline agreement. Since Stateline refused, it was agreed that the Campbell's attorney would draft a rider to the agreement. This convinced Steve Campbell that the Campbells' money would be safe. After the Campbells checked Respondent's background and were provided with a copy of his resume, driver license and passport by Ryan, they agreed to wire the money to Respondent. Steve Campbell testified that the fact that Respondent was a Maryland attorney reassured the Campbells that he had acted as an escrow agent in the past and was familiar with escrow agreements.

"Steve Campbell signed a document, drafted by his attorney, entitled 'Rider to Escrow Agreement Between Stateline Capital Corp. and Asian Energy, Ltd.' The Rider, dated April 30, 1999, was signed by Ryan, on behalf of Stateline, and Respondent, as escrow agent. When Steve Campbell signed the agreement, Respondent had not yet signed it. Later, Steve Campbell received a copy with Respondent's signature. The Rider has a facsimile line on the top indicat-

ing that it was sent by Respondent. The Rider to Escrow Agreement at paragraphs two an three provides:

2.   Stateline shall cause the funds necessary to pay the Escrow Funds Provider to be paid at the closing and netted out of the gross loan proceeds, in a manner to be agreed upon by counsel for Stateline and the Escrow Funds Provider.

3.   In the event that the loan cannot be funded, Stateline shall provide immediate notice to the Escrow Funds Provider and the Escrow Agent shall refund the Escrow deposit directly to the Escrow Funds Provider.

"Ryan also sent Steve Campbell an Escrow and Disbursing Agreement dated March 17, 1999, which was not signed by Respondent. The agreement has handwritten language that states: 'In addition escrow funds will not be transferred out of the State of Maryland for any reason until completion of transaction and reimbursement to borrowers.' Steve Campbell was aware this statement was inserted and was further assured of the safety of his funds and believed that he had a stronger agreement as the result of the modification of the agreement.[11]

"The original time limit for funding was to be 60 banking days or 90 days total. In October 1999, Steve Campbell requested return of the money. In November, Ryan met with Steven Campbell and other Asian Energy investors. During the meeting, Ryan said that the funding was available, that they were going to get their money and not to 'rock the boat.' No loan was ever received.

"On February 29, 2000, Steve Campbell's attorney sent a letter to Respondent and Ryan in which he demanded return of the Campbells' funds. There was no response to

---

11.   Respondent argues that he never saw this "additional" language added to the generic escrow agreement in the Campbell matter, language that does not appear in the dozens of other agreements provided to petitioner in this case. Due to the undiluted egregiousness of respondent's otherwise appearing misconduct, we shall not address this unavailing contention raised by respondent in one of his exceptions challenging his awareness of the "additional" language.

this letter. After multiple requests for return of the commitment fee, Steve Campbell received a copy of a letter that Payne sent to Asian Energy, Ltd., promising the return of the commitment fee on May 26, 2000. Steve Campbell also phoned Respondent on numerous occasions. Although Steve Campbell spoke to a woman who identified herself as Respondent's wife and left messages, Respondent never returned the calls.

"Prior to sending their complaint to Petitioner, the Campbells sent a copy to Respondent. In response, he received a letter signed by both Respondent and Ryan dated January 8, 2001. In the letter, Respondent and Ryan indicated that they were continuing their efforts to get the deposit refunded. The letter also stated that the 'lodging of any complaint shall adversely affect not only [Respondent] but Mr. Ryan as well, and shall assuredly destroy any possibility of [Ryan's] performing at this critical stage.' Respondent promised that he and Ryan would keep the Campbells updated concerning 'our' efforts to secure the return of the deposit and the funding of Asian Energy.

"In response to the Campbells' complaint, Respondent sent Petitioner a letter dated February 13, 2000. Respondent indicated that Asian Energy Ltd. had received a funding commitment for its project from Grindstone International and that 'we' expected the complaint to be retracted as having been filed in error once the Campbells learned of the funding. Enclosed with Respondent's letter was a letter dated December 15, 2000 from Ryan to James Sylvester of Asian Energy Ltd. offering a loan commitment to Asian Energy in the amount of $4.5 million. Sylvester provided Steve Campbell with a similar letter he had actually received from Ryan dated December 15, 2000. This letter, however, called for a $5.5 million loan and the wording of page three differed from the letter provided by Respondent. The letter that Sylvester actually received called for no commitment fee. The letter Respondent provided to Petitioner called for a commitment fee of $200,000 payable by Asian Energy to Grindstone upon acceptance of

the loan terms. The commitment fee previously paid to Stateline 'shall be credited in full satisfaction of this requirement.' It is clear to this Court that the document that Respondent provided to Petitioner was not the letter that was actually sent to Sylvester.

"Steve Campbell testified that he did not authorize Respondent or anyone else to disburse the $200,000 commitment fee he sent to Respondent and was unaware of the disbursements made by Respondent following receipt of his funds.

"On cross-examination, Steve Campbell indicated that he believed the funds were 'sitting in [an] escrow account pledged so that they could acquire the funding.' After further questioning by Respondent's counsel, Steve Campbell indicated that 'pledged' was the wrong use of the term and that he understood the money was put in an escrow account to help secure the loan."

. . .

### "Beaver Dam Project/Thomas E. Carswell/G. Marcus Hodge

"In 1999, Thomas Carswell (hereafter 'Carswell') and Luis Moreno (hereafter 'Moreno') became involved in a land development project called Beaver Dam Investments (hereafter 'Beaver Dam'). In October 1999, Moreno entered into an agreement with Stateline whereby Stateline would obtain a loan of over $25 million to finance the Beaver Dam project. Moreno was to receive an unconditional commitment from Stateline for the loan upon deposit of $100,000 to Respondent's escrow account on or before November 19, 1999. On or about November 3, 1999, two deposits totaling $100,000 were deposited into Respondent's escrow account as a commitment fee on behalf of Beaver Dam. On November 4, 1999, Respondent disbursed these funds to unrelated parties.

"Moreno's attorney, G. Marcus Hodge (hereafter 'Hodge'), testified at his deposition that, in the fall of 1999,

he spoke with Ryan and Payne of Stateline. During this conversation, Hodge was told that Respondent was an attorney who would hold certain escrow deposits for a loan transaction that Moreno was attempting to acquire from Stateline. On November 24, 1999, Hodge wrote to the Respondent and requested a copy of the escrow agreement. On November 30, 1999, Hodge sent a letter to Stateline in which he stated that if the promised loan transaction did not close by the end of the week, Moreno would lose his opportunity to purchase the Beaver Dam property.

"Between November 24 and December 7, 1999, Hodge left several telephone messages with the Respondent's office that were never returned. On December 7, 1999, Hodge again wrote to respondent requesting a copy of the escrow agreement. On that same day, Respondent faxed a letter to Hodge in which he promised to fax a copy of the escrow agreement to Hodge that week and send a signature by mail.

"Although the Beaver Dam commitment fee left the escrow account on November 4, 1999, Respondent faxed a letter to Hodge on December 16, 1999, stating: '... please be assured that we shall hold your client's refundable loan commitment fee or 100k in escrow pending the outcome of this undertaking.' On December 17, 1999, Hodge wrote to Payne following his review of the Escrow and Disbursing Agreement and suggested revisions to the agreement. A copy of this letter as well as a copy of the Escrow and Disbursing Agreement was sent to Respondent.

"On January 12, 2000, Hodge sent Respondent a copy of a letter to Stateline in which he advised that, if he did not receive the loan proceeds by January 28, 2000, the deposit should be returned. On February 28 and March 3, 2000, Hodge wrote to the Respondent and demanded an immediate refund of the deposit. The Respondent did not respond to either of these two letters. On March 7, 2000, Hodge wrote to Respondent and threatened to complain to the Maryland, Florida, Virginia and District of Columbia bars. Respondent faxed a reply to Hodge in which he stated,

among other things, that he 'got no pay' for serving as Statelines' agent. Hodge claims that in a March 8, 2000 telephone call, Respondent told Hodge that his client's funds were in a Bank of America account, that Respondent would open a separate escrow account solely to hold the $100,000 Beaver Dam commitment fee, and that Respondent would be the only one authorized to withdraw those funds as per the escrow agreement. Respondent also told Hodge that he would provide the names and addresses of the loan officer who was familiar with the terms of the account. Respondent never provided this information.

"On March 10, 2000, Hodge wrote to Respondent to confirm that the separate escrow account had been opened. In his letter, Hodge stated: '. . . our client is holding you, as the agreed upon Escrow Agent, personally responsible for the safe keeping of this $100,000 refundable commitment fee.' On March 13, 2000, Respondent replied, falsely representing that he was holding 'one hundred thousand dollars intact in [my] escrow account.' Respondent enclosed a bank statement/profile that showed the account balance to be $101,474.84.

"This Court finds the following transactions to be particularly egregious. At the hearing before this Court the Petitioner's witness testified that on March 13, 2000, Respondent caused $100,000 to be wired into the escrow account from his personal friend, Desmond Kramer. After this deposit was made, Respondent had an account statement printed, which he provided to Hodge, showing the balance to be $101,474.84. On March 17, 2000, the $100,000 was transferred from the account to an unknown destination. At this Court's hearing, Respondent corroborated this story and testified that Desmond Kramer was his personal friend who had no relationship with Stateline and that Desmond Kramer loaned him the $100,000 so it would look like Hodge's client's money was in the escrow account. On or about March 29, 2000, Payne transferred $100,000 to Hodge's trust account.

"This Court notes that Desmond Kramer received an earlier $100,000 disbursement from Respondent's escrow account on January 13, 2000. When questioned about this disbursement, Respondent was first unable to explain why he transferred these funds from the escrow account. He then indicated that Stateline owed these funds to Kramer, even though Kramer had not deposited any funds into the account prior to January 13, 2000.

. . .

*"Conclusions of Law*

"This Court finds that Respondent violated Maryland Rules of Professional Conduct 1.15(a) and (b), 8.1(b) and 8.4(a), (b) and (c). This Court also finds that Respondent violated Business Occupations and Professions Article Sections 10–306 and 10–606(b) and Maryland Rule 16–609.

### "MRPC 1.15

"MRPC 1.15(a) requires that a lawyer hold property of clients or third persons separate from the lawyer's own property. It is clear to this Court that Respondent made several escrow account transactions involving his personal funds, his corporate entity and loans from personal friends. Respondent never disputed that these transactions occurred. There is clear and convincing evidence that Respondent violated MRPC 1.15(a).

"Respondent cannot escape responsibility for his conduct by arguing that he merely followed the instructions of his client, Stateline. Pursuant to MRPC 1.15(b), Respondent owed a fiduciary duty to third parties as well as his client. Respondent had an obligation to hold the entrusted funds, promptly return them to the depositors upon request and promptly render a full accounting upon request. It is clear to this Court that Respondent did not hold the funds in escrow for any significant length of time and that Respondent only refunded commitment fees to several depositors after they filed complaints with the Attorney Grievance

Commission. This Court also notes that Respondent even provided G. Marcus Hodge a false accounting in connection with the Carswell complaint. There is clear and convincing evidence that Respondent violated MRPC 1.15(b).

### "MRPC 8.1(b)

"Respondent violated MRPC 8.1(b) when he knowingly failed to respond to a lawful request for information by Petitioner. The evidence established that Petitioner requested that respondent provide bank records relating to his escrow account in connection with the Bryers and Kent complaints. Respondent never provided these records, and it is clear that these records are not confidential communications protected by MRPC 1.6.

"There is clear and convincing evidence that Respondent did not act to avoid, and in fact wanted to give, the impression that Bryers's and Kent's funds were maintained in the escrow account at the time Petitioner received their complaints. Respondent merely informed Petitioner that he had refunded the commitment fees. The Petitioner only became aware that the funds were not held in escrow after it subpoenaed the bank records.

### "MRPC 8.4

"Respondent has violated MRPC 8.4(a) because this Court has found by clear and convincing evidence that he violated more than one Rule of Professional Conduct through his use of the escrow account. This Court need not consider Respondent's intent in finding that he violated Rule 8.4(a).

"As set out below, this Court finds that Respondent violated Md.Code Ann., Bus. Occ. & Prof. Sections 10–306 and 10–606 through his misuse of an attorney trust fund. Violation of these sections constitutes a misdemeanor. There is no requirement that the Respondent be charged with or prosecuted for a crime for him to be found in violation of MRPC 8.4(b). *Attorney Grievance Comm'n v. Garland,* 345 Md. 383, 692 A.2d 465 (1997).

"This Court finds that Respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of MRPC 8.4(c). Respondent knew early in his representation of Stateline that depositors expected that their money would remain in the escrow account. In a February 12, 1999 letter to Ryan and Payne, Respondent expressed his concern as to the use of the escrow account. Respondent signed multiple escrow agreements, addenda and riders that led depositors to believe that the commitment fees remained in escrow. In telephone calls and letters, he repeatedly assured depositors and their attorneys that their commitment fees were in the escrow account. At the hearing before this Court, Respondent testified that he 'quibbled' with the truth by not actually saying 'your money is here,' but that he never told them that the money was not in the account. This conduct is the very essence of misrepresentation and deceit. Respondent clearly violated MRPC 8.4(c).

### "Bus. Occ. & Prof. §§ 10–306 and 10–606

"This Court finds by clear and convincing evidence that Respondent wilfully used trust money for a purpose other than that for which it was entrusted to him. ' "Trust money" means a deposit, payment, or other money that a person entrusts to a lawyer to hold for the benefit of a client or a beneficial owner.' Md.Code Ann., Bus. Occ. & Prof. § 10–301(d) (2000 Repl.Vol.). Section 10–606 states that an attorney is guilty of a misdemeanor if he wilfully violates Section 10–306. Respondent knew that the depositors believed the funds would be held in escrow until the loans had been funded and that the commitment fees would be returned if the loans were not funded.

"Respondent testified at the instant hearing that he believed Stateline's customers were aware that the funds would not remain in his account. Kent, the Campbells, Carswell … all testified in their depositions that they expected Respondent to hold the commitment fees in escrow until the loans were funded. The numerous escrow agreements, addenda, riders, telephone calls and written corre-

spondence outlined in this Court's findings of fact lend credence to the assertions of the depositors. Respondent knew that the depositors were sending their commitment fees to his account to be held in escrow.

"When the depositors demanded refunds, Respondent failed to disclose that he no longer held the funds. In the case of the Carswell complaint, Respondent intentionally misrepresented to Hodge that commitment fees were being held in his escrow account. Respondent went to great lengths to continue the ruse by depositing $100,000 from his friend Desmond Kramer into the account to raise the balance and satisfy Hodge. If, as Respondent suggests, Hodge's clients were aware that the funds were not in the escrow account, this complicated deception would have been unnecessary. Likewise, Respondent also falsely represented to Kent in June or July 1999 that he still held Kent's money in escrow. Such conduct is inconsistent with a belief that the customers were aware the funds were no longer in escrow.

"Respondent clearly acted as escrow agent for his client, Stateline, as well as for the depositors. At the hearing, Respondent argued that he only had an agency duty to his client and that he owned no duty to the depositors.

> [T]here is a fundamental difference between serving as a traditional agent and acting as an escrow agent or trustee. A traditional agent is one who consents to act on behalf of and is subject to the control of his principal, . . . while an escrow agent, like a trustee, is a stranger to all parties in the sense that he is insulated from their dictates and acts subject only to the control of the conditions and specifications contained in the escrow or trust agreement.

*Campen v. Talbot Bank of Easton,* 271 Md. 610, 616, 319 A.2d 125, 129 (1974) (internal citations omitted). As the Court of Appeals has made abundantly clear, Respondent's contention is incorrect. It is clear to this Court that Respondent violated Section 10–306. Furthermore, his misuse of the escrow account was not accidental or negligent, it was willful. Respondent also violated Section 10–606.

### "Maryland Rule 16–609

"Petitioner alleged that Respondent used funds that were required to be deposited into an attorney trust account for an unauthorized purpose in violation of Rule 16–609. This Court finds that the commitment fees were to be deposited in an escrow account and held there until the financing of the depositors' loans. An escrow account is an attorney trust account within the meaning of Rule 16–609. *See* Md. R. 16–602(c) (2002) (stating that ' "[a]ttorney trust account" means an account, including an escrow account, maintained in a financial institution for the deposit of funds received or held by an attorney or law firm on behalf of a client or third person.'). Respondent was not authorized by the depositors, as interested third parties, to disburse the commitment fees until the loans were funded. This Court finds clear and convincing evidence that Respondent violated Rule 16–609.

### *"Mitigation*

"Respondent must prove mitigating factors by a preponderance of the evidence. Md. R. 16–757(b) (2003). Respondent stated that he was an AV-rated Maryland lawyer and that he has practiced law for over thirty years in various states without reprimand or allegations of misconduct. Petitioner does not dispute these facts. Respondent also presented evidence that he repaid some of the commitment fees from his personal funds and has suffered financial loss because of his relationship with Ryan and Payne. However, financial ramifications of an attorney's misconduct are not mitigating factors in a disciplinary action. *Attorney Grievance Commission v. Spery*, 371 Md. 560, 572, 810 A.2d 487, 494 (2002)." [Some alterations added.] [Footnotes omitted.]

## II.  Discussion

### A.  Standard of Review

This Court reviews attorney disciplinary proceedings according to the well established standard resting on the

premise that " '[t]his Court has original jurisdiction over attorney disciplinary proceedings.' " *Attorney Grievance Comm'n v. Granger,* 374 Md. 438, 450, 823 A.2d 611, 618 (2003) (quoting *Attorney Grievance Comm'n v. Harris,* 371 Md. 510, 539–40, 810 A.2d 457, 474–75 (2002)). *See also Attorney Grievance Comm'n v. Dunietz,* 368 Md. 419, 427, 795 A.2d 706, 710–711 (2002) (citing *Attorney Grievance Comm'n v. Snyder,* 368 Md. 242, 253, 793 A.2d 515, 521 (2002)); *Attorney Grievance Comm'n v. Harris,* 366 Md. 376, 388, 784 A.2d 516, 523 (2001); *Attorney Grievance Comm'n v. Gavin,* 350 Md. 176, 189, 711 A.2d 193, 200 (1998); *Attorney Grievance Comm'n v. Adams,* 349 Md. 86, 93, 706 A.2d 1080, 1083 (1998); *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 470, 671 A.2d 463, 473 (1996); *Attorney Grievance Comm'n v. Kent,* 337 Md. 361, 371, 653 A.2d 909, 914 (1995); *Attorney Grievance Comm'n v. Powell,* 328 Md. 276, 287, 614 A.2d 102, 108 (1992). Furthermore, "[a]s the Court of original and complete jurisdiction for attorney disciplinary proceedings in Maryland, we conduct an independent review of the record." *Attorney Grievance Comm'n v. Garfield,* 369 Md. 85, 97, 797 A.2d 757, 763 (2002) (quoting *Snyder,* 368 Md. at 253, 793 A.2d at 521 (citing *Attorney Grievance Comm'n v. Garland,* 345 Md. 383, 392, 692 A.2d 465, 469 (1997))).

In our review of the record, "[t]he hearing judge's findings of fact will be accepted unless we determine that they are clearly erroneous." *Garfield,* 369 Md. at 97, 797 A.2d at 764 (quoting *Snyder,* 368 Md. at 253, 793 A.2d at 521 (citations omitted)). *See also Dunietz,* 368 Md. at 427–28, 795 A.2d at 710–11 ("The hearing judge's findings of fact are *'prima facie* correct and will not be disturbed unless clearly erroneous.' ") (quoting *Attorney Grievance Comm'n v. Zdravkovich,* 362 Md. 1, 21, 762 A.2d 950, 960 (2000)); *Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 388, 794 A.2d 92, 100 (2002) ("Factual findings of the hearing judge will not be disturbed if they are based on clear and convincing evidence."). Clear and convincing evidence "must be more than a mere preponderance but not beyond a reasonable doubt." *Harris,* 366 Md. at 389, 784 A.2d at 523–24 (quoting *Attorney Grievance Comm'n*

*v. Mooney*, 359 Md. 56, 79, 753 A.2d 17, 29 (2000)). We recently explained in *Dunietz* that "[a]s to the hearing judge's conclusions of law, 'our consideration is essentially *de novo.*'" *Dunietz*, 368 Md. at 428, 795 A.2d at 711 (quoting *Attorney Grievance Comm'n v. Thompson*, 367 Md. 315, 322, 786 A.2d 763, 768 (2001) (quoting *Attorney Grievance Comm'n v. Briscoe*, 357 Md. 554, 562, 745 A.2d 1037, 1041 (2000))).

Respondent has filed with this Court several exceptions to the hearing judge's findings of fact and conclusions of law. After a review of the record, we accept all of the hearing judge's findings of fact and conclusions of law to the extent that they relate to the five complainants forming the bases of the Commission's charges against respondent and hold that the hearing judge's findings and conclusions are based on clear and convincing evidence. *See Garfield*, 369 Md. at 97, 797 A.2d at 763–64; *Dunietz*, 368 Md. at 427–28, 795 A.2d at 710–11, *Monfried*, 368 Md. at 388, 794 A.2d at 100.

## B. Respondent's Exceptions

Respondent makes numerous exceptions to Judge Davis–Loomis' findings of facts and conclusions of law. Excluding respondent's exceptions pertaining to those individuals who did not file complaints against respondent with petitioner, the remaining factual exceptions encompass one broad exception challenging the completeness of the hearing judge's findings generally and in regard to Mr. Bryers, Mr. Kent, the Campbells and Mr. Carswell. Respondent argues that the hearing judge's findings ignore different language of the escrow agreements, *i.e.*, language that allegedly supports his actions in disbursing the escrow funds. Also, respondent argues that the hearing judge misstates the relevance of certain documents presented and generally that the hearing judge's findings are incomplete and misleading. Respondent's factual exceptions are without merit. They serve only to place the facts in a light most favorable to him and are merely attempts to shed skepticism upon the findings made by the hearing judge. Respondent attempts to downplay his active role in the scheme to disburse the funds out of the escrow account

contrary to the terms of the agreements and contrary to the beliefs of the depositors. In most of his exceptions respondent proffers little or no valid arguments or reasons to substantiate his exceptions, rather he merely emphasizes the role of the various parties involved and other irrelevant facts supporting his claim that he too was the victim of a complex scam by Stateline's principals and, therefore, the hearing judge should not have found as she did.

◼ As we previously indicated, this is a deceptively complex disciplinary proceeding given the many individuals involved, the many witnesses who testified, the many documents, agreements and letters submitted as exhibits and the many facts relevant to the complaints. Respondent now, with his factual exceptions, attempts to use the complex nature of the transactions, and number of parties involved in those transactions, to detract from Judge Davis–Loomis' painstakingly thorough findings. Judge Davis–Loomis focused upon the fact that respondent misappropriated money each time he disbursed funds out of the escrow account contrary to the role he assumed as escrow agent of that account and the escrow agreements he signed in that capacity and that he later lied about and "covered up" those misappropriations.

◼ In light of the testimony provided and the facts presented to Judge Davis–Loomis at respondent's hearing, we accept the hearing judge's findings of fact as they are not clearly erroneous. We "keep in mind that it is elementary that the judge 'may elect to pick and choose which evidence to rely upon.'" *Attorney Grievance Comm'n v. Sheridan,* 357 Md. 1, 17, 741 A.2d 1143, 1152 (1999) (quoting *Attorney Grievance Comm'n v. Kemp,* 303 Md. 664, 675, 496 A.2d 672, 677 (1985)).

We now address respondent's exceptions tailored to the hearing judge's conclusions of law; they are respondent's exceptions in Part II, labeled "A" through "E," with subsections.

█ Respondent's exception "II.A." is termed "general observations." In this exception, respondent generally excepts to the hearing judge's conclusions in light of his "unique" case. Once more, respondent focuses upon his alleged unintentional role in the "scam" and how he "expended hundreds of thousands of dollars of his own money in order to satisfy third parties who dealt with his client [Stateline]" (alteration added). Additionally, respondent notes that the Inquiry Panel found that he had testified truthfully and candidly and had not intended to engage in fraud, dishonesty, deceit or misrepresentation, but that "regrettably" respondent "allowed himself to be used by Stateline," and thus violated various provisions of the MRPC. These factors do not detract from the hearing judge's conclusions of law. After being presented with all the facts and testimony, the hearing judge found differently and made conclusions contrary to the conclusions reached by the Inquiry Panel. To the extent she found differently, we accept her findings and conclusions. Respondent's exception "II.A." is overruled.

█ Respondent's next exception "II.B." pertains to his MRPC 8.1(b) violation, which the hearing judge concluded was based upon the fact that respondent failed to disclose information to petitioner during its investigation. Respondent argues that he has "turned over hundreds of documents in this case" voluntarily and that he did not violate MRPC 8.1(b) by failing to turn over bank records to petitioner because at the time he was represented by counsel who was attempting to gather his records and this fact was communicated to Bar Counsel. However, the evidence more accurately reflects that respondent did fail to provide bank records relating to his escrow account in connection with the Bryers and Kent complaints and that respondent only turned over such records when petitioner issued its subpoena for those records. As the hearing judge notes:

> "There is clear and convincing evidence that Respondent did not act to avoid, and in fact wanted to give, the impression that Bryers's and Kent's funds were maintained in the escrow account at the time Petitioner received their

complaints. Respondent merely informed Petitioner that he had refunded the commitment fees. The Petitioner only became aware that the funds were not held in escrow after it subpoenaed the bank records."

Respondent did not cooperate fully with Bar Counsel in this manner, *i.e.*, he failed to turn over the bank records to avoid disclosure of the fact that the funds that should have been in the escrow account at the relevant time were, in fact, not there. Respondent violated MPRC 8.1(b) by failing to respond fully to a lawful demand for information from Bar Counsel. Respondent's exception is overruled.

■ Respondent's exception "II.C." is to the hearing judge's conclusion that he violated MRPC 1.15(a) and (b) and Maryland Rule 16–609, which pertain to safekeeping of property and prohibited transactions in respect to an attorney overseeing funds in trust accounts. Respondent's argument that he did not "technically" violate the rules because Stateline was his "client," not the various individuals who deposited commitment fees into the escrow account, is without merit. Respondent signed various escrow agreements which, by their very terms, held him responsible to the depositors for the funds placed in his escrow account and held him responsible to third parties named in those agreements, *i.e.*, those depositors. Respondent knew that he had to maintain the fees in the escrow account, pending the loans being secured by Payne and Ryan, and, if the loan was not secured in each instance, then the funds were to be returned to the depositor directly out of the escrow account wherein the depositor had placed the money. The commitment fees were to remain untouched, in the escrow account until the closing of the loan date. Disbursements of the commitment fees out of the escrow account pertaining to the Bryers, Kent, Campbell and Carswell matters were for unauthorized purposes and were improper disbursements by respondent. Respondent violated MRPC 1.15(b) by failing to maintain escrow funds and deliver those funds back to the depositors upon request after the loan procurement process fell through. MRPC 1.15(b) was also violated by his failure to render to the depositors, upon

request, a full accounting of the funds in the escrow account. As the evidence reflects, respondent also made several escrow account transactions involving his personal funds, directly contrary to MRPC 1.15(a), which requires a lawyer to hold the property of clients or third persons separate from the lawyer's own property. It is patently clear that respondent committed violations of MRPC 1.15(a) and (b) and Md. Rule 16–609. This exception is overruled.

Respondent's exception "II.D." is also without merit. Here, respondent excepts to the hearing judge's conclusion that he violated 8.4(b) and (c). Respondent argues that he did not commit a criminal act that reflects adversely on his honesty, trustworthiness or fitness as a lawyer and/or engage in conduct involving dishonesty, fraud, deceit or misrepresentation. To support this exception, respondent relies upon selected case law; however, none of these cases support his contentions in this exception. Again, respondent proffers no valid argument to support this exception or contradict the hearing judge's finding that he knew that the various depositors expected their commitment fees to be held in the escrow account pursuant to the terms of the escrow agreement and not removed by him at the whim of Payne and Ryan for other purposes. As the hearing judge emphasized, there are no arguments proposed by respondent to dispute the fact that he signed many agreements, addenda and riders leading the depositors to believe their funds were secure. Also, respondent cannot evade the hearing judge's finding that he misled depositors and Bar Counsel about the funds in the escrow account in several telephone calls and letters. His conduct was deceitful. As the hearing judge stated, "This conduct is the very essence of misrepresentation and deceit." The hearing judge properly concluded that respondent violated MRPC 8.4(b) by his violation of sections 10–303 and 10–606 of the Business Occupations and Professions Article. The hearing judge also properly concluded that respondent's conduct involved dishonesty, fraud, deceit or misrepresentation in violation of MRPC 8.4(c).

██    Lastly, we address respondent's exception "II.E.," which pertains to the hearing judge's conclusion that he violated sections 10–306 and 10–606 of the Business Occupations and Professions Article by misusing the money in the escrow account for a purpose other than that set forth in the escrow agreements he signed as escrow agent. Specifically, section 10–606 makes it a misdemeanor to willfully violate section 10–306, which respondent did by disbursing the funds out of the escrow account. Respondent argues that evidence reflects that the individuals depositing the funds into the escrow account knew that the commitment fees might have been taken out of the escrow account for purposes of securing the various loans. However, respondent's argument in this exception does not overcome the contradictory evidence on the record, particularly the testimony of the various depositors who stated that they expected respondent to hold the commitment fees in escrow until the loans were funded. Respondent's argument also contradicts the plain language of the escrow agreements themselves, which required that the funds remain in escrow until the closing of the loan. When depositors inquired, respondent repeatedly failed to disclose to the depositors that he no longer held the commitment fees in escrow. In one instance, respondent intentionally misrepresented to an attorney representing a complainant that funds were being held in his escrow account that, in fact, were not there. Respondent also went to great lengths to deceive everyone involved and "continue the ruse" by putting funds borrowed from a friend into the escrow account to falsify the true account balance. Respondent undertook a complicated deception to hide the fact that the funds that were to be held in trust were gone. It was this testimony and evidence that hearing judge relied upon to conclude that respondent violated 10–306 and 10–606(b).

We hold that respondent has failed to establish facts sufficient to overcome Judge Davis–Loomis' findings and conclusions regarding the Bryers, Kent, Campbell and Carswell matters. Therefore, we overrule all of respondent's exceptions for the reasons indicated.

### III. Sanction

■■■ Respondent's exceptions having been overruled, we must now consider the appropriate sanction for respondent's misconduct. In the case *sub judice,* the Attorney Grievance Commission, through Bar Counsel, argues that disbarment is appropriate, while respondent advocates that he has not violated any of the rules and proffers generally that no sanction should be imposed upon him. We agree with Bar Counsel. Recently, in *Attorney Grievance Comm'n v. McLaughlin,* 372 Md. 467, 510, 813 A.2d 1145, 1170 (2002) (quoting *Attorney Grievance Comm'n v. Clark,* 363 Md. 169, 183–84, 767 A.2d 865, 873 (2001)), we recognized that:

> " 'the purpose of the sanctions is to protect the public, to deter other lawyers from engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal profession. *See Attorney Grievance Comm'n of Maryland v. Hess,* 352 Md. 438, 453, 722 A.2d 905, 913 (1999) (quoting *Attorney Grievance Comm'n v. Webster,* 348 Md. 662, 678, 705 A.2d 1135, 1143 (1998)). We have stated that '[t]he public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed.' *Attorney Grievance Comm'n of Maryland v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997). Therefore, the appropriate sanction depends upon the facts and circumstances of each particular case, including consideration of any mitigating factors. *See Attorney Grievance Comm'n of Maryland v. Atkinson,* 357 Md. 646, 656, 745 A.2d 1086, 1092 (2000); *Attorney Grievance Comm'n of Maryland v. Gavin,* 350 Md. 176, 197–98, 711 A.2d 193, 204 (1998).' "

We have upheld the hearing court's findings, by clear and convincing evidence, that respondent violated several rules of professional conduct including MRPC 1.15(a) and (b), by failing to keep the clients' funds properly in the escrow account, MRPC 8.1(b) by failing to hand over pertinent financial records to Bar Counsel upon request and committing professional misconduct under MRPC 8.4(a), (b) and (c), by misappropriat-

ing funds under Md. Rule 16–609 and by violations of sections 10–303 and 10–606 of the Business Occupations and Professions Article of the Maryland Code.

Behavior such as that in this case, in and of itself, "in the absence of mitigating circumstances, ordinarily warrants disbarment." *Attorney Grievance Commission v. Milliken,* 348 Md. 486, 519–20, 704 A.2d 1225, 1241–42 (1998). In *Milliken,* we concluded that "numerous trust account violations" and "conversion of client monies in failing to return unearned fees," among other things, mandated Milliken's disbarment. *Id. See also Attorney Grievance Comm'n v. Powell,* 369 Md. 462, 475, 800 A.2d 782, 789–90 (2002)(recognizing that "[i]t has long been the position of this Court that disbarment is the appropriate sanction for intentional dishonest conduct" and stating that in cases involving "intentional dishonesty, fraud, misappropriation and the like, we will not accept as compelling extenuating circumstances 'anything less than the most serious and utterly debilitating mental or physical health conditions ...' ")(quoting *Attorney Grievance Comm'n v. Vanderlinde,* 364 Md. 376, 413–14, 773 A.2d 463, 485 (2001)); *Attorney Grievance Comm'n v. Bernstein,* 363 Md. 208, 226, 768 A.2d 607, 617 (2001) (recognizing that "[w]e have held consistently that '[m]isappropriation of funds by an attorney is an act infested with deceit and dishonesty and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction' ") (citations omitted).

■■■ Honesty is of paramount importance in the practice of law. We have said:

> " 'Unlike matters relating to competency, diligence, and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character.' "

*Attorney Grievance Comm'n v. Angst,* 369 Md. 404, 420, 800 A.2d 747, 757 (2002) (quoting *Attorney Grievance Comm'n v.*

*Lane,* 367 Md. 633, 646, 790 A.2d 621, 628 (2002) (citation omitted)). Moreover, " '[t]he practice of law carries with it special responsibilities of self-regulation, and attorney cooperation with disciplinary authorities is of the utmost importance to the success of the process and the integrity of the profession.' " *Powell,* 369 Md. at 473–74 n. 8, 800 A.2d at 789 n. 8 (quoting *Attorney Grievance Comm'n v. Fezell,* 361 Md. 234, 255, 760 A.2d 1108, 1119 (2000)).

In addition, we have stated that "[i]mposing a sanction protects the public interest 'because it demonstrates to members of the legal profession the type of conduct which will not be tolerated.' " *Mooney,* 359 Md. at 96, 753 A.2d at 38 (quoting *Attorney Grievance Comm'n v. Ober,* 350 Md. 616, 632, 714 A.2d 856, 864 (1998)) (citation omitted). *See also Attorney Grievance Comm'n v. Sullivan,* 369 Md. 650, 801 A.2d 1077 (2002) (disbarring attorney for theft of estate funds while serving as personal representative); *Powell,* 369 Md. 462, 800 A.2d 782 (disbarring attorney for commingling trust funds with his own personal funds to intentionally hide assets from creditors); *Attorney Grievance Comm'n v. Vlahos,* 369 Md. 183, 186, 798 A.2d 555, 556 (2002) ("It has long been the rule in this State that absent compelling extenuating circumstances, misappropriation by an attorney is an act infected with deceit and dishonesty and ordinarily will result in disbarment"); *Snyder,* 368 Md. at 276, 793 A.2d at 535 (holding that a lawyer's "dishonest and deceitful conduct with regard to the misuse of his client escrow account alone would be sufficient to warrant a sanction of disbarment"); *Vanderlinde,* 364 Md. at 413–14, 773 A.2d at 485 (stating that the Court will disbar an attorney for misappropriation, and the like, unless " 'compelling extenuating circumstances,' anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the 'root cause' of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law 'and with the MRPC"); *Bernstein,* 363 Md. at 226–30, 768 A.2d at 616–19 (holding that disbarment is appropriate for an attorney's misappropriation of funds); *Attorney Grievance*

*Comm'n v. Tomaino,* 362 Md. 483, 498, 765 A.2d 653, 661 (2001) (recently reaffirming this Court's precedent that misappropriation is inherently deceitful, thus requiring disbarment); *Sheridan,* 357 Md. at 27, 35–36, 741 A.2d at 1157, 1161–62 (1999) (indefinitely suspending attorney who misappropriated funds only because significant mitigatory facts were present); *Attorney Grievance Comm'n v. Sabghir,* 350 Md. 67, 84, 710 A.2d 926, 934 (1998) (disbarring attorney for misappropriation and fraud relating to money); *Attorney Grievance Comm'n v. Hollis,* 347 Md. 547, 560, 702 A.2d 223, 230 (1997) (disbarring attorney for misappropriating over $80,000); *Attorney Grievance Comm'n v. Kenney,* 339 Md. 578, 586–88, 664 A.2d 854, 858 (1995) (indefinitely suspending, instead of disbarring, attorney for misappropriation because of mitigatory factors); *Attorney Grievance Comm'n v. Williams,* 335 Md. 458, 474, 644 A.2d 490, 497–98 (1994) (disbarring attorney for violating several rules and emphasizing that the misappropriation of client funds was the most egregious violation); *Attorney Grievance Comm'n v. White,* 328 Md. 412, 421, 614 A.2d 955, 960 (1992) (disbarring attorney who misappropriated over $14,000 of client's money); and *Attorney Grievance Comm'n v. Ezrin,* 312 Md. 603, 608–09, 541 A.2d 966, 969 (1988) (disbarring attorney for embezzling over $200,000 from his firm).

In light of the hearing judge's findings, respondent's numerous violations, his egregious conduct and this Court's consistent practice of disbarment of lawyers who, absent mitigation or extenuating circumstances, misappropriate client funds, we hold that the appropriate sanction for respondent's conduct is disbarment.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(c), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST SCOTT G. SMITH.**